**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **DALE AND LINDA KENNETT** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **No. 07-6702** |
| | * | |
| **AMICA MUT. INS. CO.** | * | **SECTION "B" (5)** |

## ORDER AND REASONS

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Rec. Doc. No. 37) is **DENIED without prejudice and with provisos noted below.**[1] Plaintiffs' opposition thereto (Rec. Doc. No. 70) and Defendant's Reply to Plaintiffs' opposition (Rec. Doc. No. 79-2) were also considered in reaching this decision.

Dale and Linda Kennett ("Plaintiffs") filed this suit against Amica Mutual Insurance Company ("Amica") on August 27, 2007 alleging a breach of contract claim stemming from alleged damages caused by Hurricane Katrina to Plaintiffs' property located in Bogalusa, Louisiana. Plaintiffs seek recovery of damages under the Homeowner's Policy, Policy No. 660817-1022, which Amica issued and was effective on August 29, 2005. That Policy provided coverage of (A) $400,000 for dwelling, (B) $40,000 for other structures, (C) $300,000 for personal property, and (D) $120,000 for loss of use. (Rec. Doc. No 37-2 at 2). To date, the Kennetts have received payments totaling $171,531.83 (Coverage A-$89,751.61; Coverage B-

---

[1] We are grateful for the work on this case by Michael Drory, a University of Pennsylvania Law School extern with our Chambers.

$19,041.63; Coverage C-$50,907.34; and Coverage D-$11,331.25). (Rec. Doc. No. 37-2 at 2; *see also* Rec. Doc. No. 37-17 at 2). However, Plaintiffs now seek a recovery of an additional payment of over $285,000. (Rec. Doc. No. 37-2).

Plaintiffs have submitted over a thousand pages worth of exhibits including (1) copies of receipts from alleged costs to repair damage from Hurricane Katrina, (2) copies of receipts from alleged Additional Living Expenses as a result of Plaintiffs displacement from Hurricane Katrina, (3) and copies of receipts and internet shopping sites from alleged replacement costs for contents that were allegedly damaged as a result of Hurricane Katrina. Parsing through these documents only makes the dispute in this case more confusing in determining whether payments Amica has already made are sufficient to cover any of Plaintiffs' new and potentially valid, but weak, claims.

**I. Structure Claim (Coverages A & B)**

Christopher Murphy, at the time a senior adjuster for Amica, first inspected Plaintiffs' property on October 14, 2005. (Rec. Doc. No. 37-2 at 3; *see also* Rec. Doc. No. 37-7). Murphy stated by Affidavit that he found no openings in the exterior walls with the exception of broken glass from windows in the back of the house. (Rec. Doc. Nos. 37-7, 37-17 at 3). He also stated that there were only "minor" water stains in the interior of the house and that both the Kennetts were living in the house at the time of his

inspection. *Id*. Murphy stated that all of the rooms inside the house were "habitable".[2] (Rec. Doc. No. 37-17 at 3). Based on his inspection of the damage to the property and experience in the claims and construction industries, Murphy estimated that all of the structural repairs could have and should have been completed within 4-6 weeks of August 29, 2005. *Id*. As a result of Murphy's inspection, and consistent with Murphy's estimate, the Kennetts were paid for damages to structure and other structures under Coverages A and B.[3]

After Murphy's inspection, Plaintiffs hired Gulf Coast Solutions, a public adjuster, to conduct its own inspection. (Rec. Doc. No. 37-17 at 3). In a report dated April 10, 2006, Gulf Coast Solutions concluded the structure damage totaled an estimated $108,382.51.[4] *Id*. Following Gulf Coast's estimate, Amica ordered a re-inspection of the property and retained Ray Vince, an employee of Baton Rouge/Brown Claims Service, Inc., to inspect the property and prepare an estimate regarding any supplemental payments for structure damages. (Rec. Doc. No. 37-17 at 4). Like Murphy, Vince concluded that there "was very little damage to the exterior of the Kennetts' residence." (Rec. Doc. No. 37-9 at 24). Specifically,

---

[2] Murphy stated that "[w]ith the exception of some minor water stains on some of the ceilings, there was nothing to indicate the house was not habitable." (Rec. Doc. No. 37–7 at 2).

[3] *See* Homeowners Loss Payment Schedule. (Rec. Doc. No. 37–3).

[4] The report states that "[t]his estimate is not final and subject to change." (Rec. Doc. No. 37–8).

Vince stated that there was "no damage to the roof and no openings in the exterior walls with the exception of broken glass from the front of the house." *Id*. Vince, like Murphy, concluded that all the rooms were habitable and that there was no evidence that the house had ever been unlivable. *Id*. Vince conducted another inspection on January 18, 2007 following which he reaffirmed that there was very little damage to the exterior of the house and that there were no openings created by Hurricane Katrina on the roof or the walls of the Kennetts' residence that would render the home uninhabitable. (Rec. Doc. No. 37-9 at 35).

Based on the Gulf Coast estimate from Plaintiffs' own adjuster, and the re-inspection by Vince, Amica issued supplemental payments that exceed the total estimated by Gulf Coast.[5] (Rec. Doc. No. 37-17 at 4). Plaintiff still seeks recovery for an additional $87,491.66 for structural damages under Coverages A and B, claiming actual repairs exceeded their own adjuster's estimate. (Rec. Doc. No. 37-17 at 4).

### A. *Plaintiffs' Exhibits and Depositions*

In support of their most recent claim for additional payments under Coverages A & B Plaintiffs submitted Exhibit 4 titled "Home Repairs." The **six hundred eleven** page exhibit contains copies of receipts and cashed checks which are further separated into thirty

---

[5] Plaintiffs was paid a total of $108,793.24 for structural damage (Coverage A–$89,751.61; Coverage B–$19,041.63). (Rec. Doc. No. 37-3).

eight sections, each one a category of alleged expenses related to alleged structural damage sustained as a result of the hurricane. (emphasis added). While Plaintiffs have provided copies of receipts and cashed checks, many of the items purchased have no relation to structural damage.[6] For example, as part of the $2,721.24 total included in the "Travel Expense" section, Plaintiffs have included receipts from Macaroni Grill, Ruby Tuesdays, Kitchen Family Restaurant, and trips to visit Mr. Kennett's father in Rhode Island. (Plaintiffs' Exhibit 4). Mr. Kennett even admits in his deposition testimony that any expenses incurred on these trips to Rhode Island should not be included in the structural damage claim, or any other claim for that matter. (Rec. Doc. No. 37-12 at 48). It should not be this Court's job to make the appropriate revisions to the claims lists in order to exclude items that do not belong.

Additionally, other items that Plaintiffs included are so vague that it would be impossible for this Court, or Amica for that matter, to determine whether a valid claim exists. For example, Plaintiff has provided copies of checks made out to "CASH" and testifying that the money was used to pay for an expense such as "labor". Without additional information, there is no proof that

---

[6] *See* Sections 2,3 Automobile Expense; Section 22 Legal Expense; Section 26 Office Expense; Section 35 Travel Expense.

the check was used to cover cost of repairing the structural damage of the insured property.

Plaintiffs need to sort through their own pile of receipts; include only those for which they have some proof of relationship to the respective claims; extract all that are either unrelated and/or the subject of prior payments by their insurer; and identify everything in an organized fashion, including indexing by at least category, coverage, and page number.

**II. Contents Claim**

With regard to personal property under Coverage C, the Kennetts' policy provides:

> **B. Coverage C - Personal Property**
>
>> 2. Windstorm or Hail
>>
>>     ...
>>
>>> This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand, or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand, or dust enters through this opening.[7]

---

[7] *See* (Rec. Doc. No. 37-17 at 5); *See also* HO 00 03 10 00 coverage form, Section I – Perils Insured against, at p. 10 of 22.

When Murphy first inspected the property on October 14, 2005 he says he was never told of any contents loss other than a TV, printer, DVD player and spoiled food. (Rec. Doc. No. 37-17 at 5). As a result, Plaintiffs were paid $1,238.38. *Id*.

Plaintiffs contend they incurred a loss to their contents in the amount of $138,740.00. (Rec. Doc. No. 70-2). Both Amica inspectors, Murphy and Vince, stated in affidavits that the damage to the property was not sufficient to cause $138,000 in contents damage. (Rec. Doc. No. 37-17 at 5). Vince also questioned whether the Kennetts owned these items and noted that there was no opening in the house that could have caused damage to the items. *Id*. Vince also concluded that almost all of the values estimated by the Kennetts were "grossly inflated." (Rec. Doc. No. 37-17 at 6).

However, as a result of Plaintiffs' depositions on August 6, 2009, discussions with Plaintiffs related to their alleged contents loss, and Vince's report, Amica made a supplemental payment under Coverage C in the amount of $46,522.92. (Rec. Doc. No. 37-17 at 6). Nevertheless, Plaintiffs still seek contents damages totaling $138,740, claiming in support internet printouts and photographs with handwritten notes pointing to the dresser/closet, which allegedly held the damaged items. (Rec. Doc. No. 37-17 at 7).

Plaintiff provides Exhibit 7, consisting of two hundred twelve pages of internet shopping printouts, receipts, and pictures of empty closets and closed dresser drawers, in support of its most

recent contents claim. Many items Plaintiffs list under their contents claim are unrelated to a Coverage C claim.[8] Plaintiff must parse through the list of claimed items and only include those items for which there is proof that the item(s) were owned at the relevant time, and were damaged as a result, of Hurricane Katrina.[9]

### III. Additional Living Expenses Claim

With regard to additional living expenses (ALE) under Coverage D, the Kennetts' policy provides:

> 1.. Windstorm or Hail
>
> If a loss covered under Section I makes that part of the residence premises where you reside ***not fit to live in***, we cover any ***necessary increase in living expenses*** incurred by you so that your household can maintain its normal standard of living. Payment will be

---

[8] Some of the items that do not belong in a Coverage C claim include: (1)5 gas cans each filled multiple times after the hurricane – $1,485.00; (2) 3 chain saws purchased after the hurricane – $2,200.00; (3) 8 propane tanks each filled multiple times after the hurricane – $800.00; (4) 45 bottles of insect spray purchased after the hurricane – $191.25; and 4 Generators – $4,400.00. (Rec. Doc. No. 37-2 at 16).

[9] In Linda Kennett's deposition she says that she no longer has access to any of the items she is claiming recovery for because she they were all thrown away. (Linda Kennett Dep. p.138). It is hard to believe that Mrs. Kennett had $78,250 worth of non-salvageable personal items in her closet as a result of Hurricane Katrina as she claims. Given her long list of non-salvageable claims she was asked during her deposition testimony if there were any personal items in her closet that were salvageable. (Linda Kennett Dep. p. 140-41). She responded that there were salvageable items and that their collective value was greater than her $78,250 claim. *Id*. Astoundingly she states that a complete list of everything that was salvageable and non-salvageable could be estimated by essentially tripling the list she created for her current claim. *Id*. This means that Linda Kennett is testifying that, at the time of Hurricane Katrina, she had approximately $234,000 worth of personal items (primarily clothes and shoes) in her closet. *Id*.

> for the ***shortest time required*** to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.[10]

It is undisputed that the Kennetts both lived in their house for approximately two weeks following the storm. (Rec. Doc. No. 37-17 at 7). Thereafter Mrs. Kennett traveled to Texas and then to California from which she did not return until May 2006 because she was involved in a car accident in California in October 2005 and her doctor told her she should not travel, and the house was not yet repaired to her standards. (Rec. Doc. No. 37-17 at 8).

Other than traveling to visit his wife, Mr. Kennett lived in the house at all times. *Id.* Within a week of the hurricane water was restored and approximately one month later electricity was restored. *Id*. Both Amica inspectors, Murphy and Vince, stated in affidavits that all rooms inside the house were habitable. *Id*. Plaintiffs were paid a total of $11,331.25 for Loss of Use-ALE, which included rent for Mrs. Kennett in California through February 2006. *Id*. at 9. Plaintiffs still seek recovery of $65,168.75 under Coverage D.

A. ***Plaintiffs' Exhibits and Deposition Testimony***

---

[10] *See* (Rec. Doc. No. 37–17 at 7); *See also* HO 00 03 10 00 coverage form, Section I – Property Coverages, at D(1), on p. 5 of 22 (emphasis added).

Plaintiffs' Exhibit 9, "Extra Living Expenses", contains over ***seven hundred*** pages of copies of receipts from alleged ALE derived from Mrs. Kennett's stay in California following the damage to her house in Louisiana. (emphasis added). Plaintiffs misunderstand the definition of ***Additional*** Living Expenses as they have included many items that do not fall under Coverage D of the policy. (emphasis added). For example, Plaintiffs include receipts for a $2.00 hot dog from Target, a $0.99 pack of Trident Gum, cigarettes, beer and birthday and anniversary dinners for relatives.

During her deposition testimony, even Mrs. Kennett agreed with counsel for Amica that she would have bought cigarettes and beer regardless of whether she was living in California or Louisiana. (Linda Kennett Deposition p. 196-8). Furthermore, Mrs. Kennett testified that she would have spent ***more*** on the birthday and anniversary dinners had they been held in Louisiana. *Id*. (emphasis added). Most of the receipts that Plaintiffs have included in support of their ALE claim appear unrelated to an ALE claim as they would have been incurred irrespective of Mrs. Kennett's displacement to California.[11] Further, the fact that Mr. Kennett was able to remain at the house, coupled with evidence of the house's habitability within weeks after the storm, substantially discredits Mrs. Kennett's ALE claim.

---

[11] Buying a hotdog at Target or a pack of gum at a convenience store are both completely unrelated and irrelevant to a claim for ***additional*** living expenses. (emphasis added).

**IV. Conclusion**

Due to the immense number of documents submitted by Plaintiffs and considering their own admissions in deposition testimony, it is impracticable to conduct a proper legal analysis of their claims at this time. Both parties have attempted to enlist the Court to perform the task of a claims adjuster, sifting through over a thousand pages of copied receipts and internet shopping printouts, many of which appear to be unrelated to asserted insurance claims here.

Plaintiffs shall resubmit their exhibits, only including relevant items that are supported by specific proof and fall within the policy definition of the respective Coverage groups, in an organized and detailed fashion. Amica has already paid a substantial sum to Plaintiffs. Plaintiffs' recalculated and resubmitted claim totals should not include items already paid by their insurer.

There is a "dispute resolution" provision in the insurance contract which is exercisable at the request of either party. That process provides a more efficient and less costly alternative.[12] (Rec. Doc. No. 37-3 at 17).

---

[12] Under "Section 1, E. Appraisal" of the policy either party may demand an appraisal of the loss. In this event, both parties will choose a competent and impartial appraiser. The two appraisers will choose an umpire. Each appraiser will then independently set the amount of loss. If they fail to agree, they will submit their differences to the umpire. (Rec. Doc. No. 37-3 at 17); *see also* See also HO 00 03 10 00 coverage form, Section I – E. Appraisal, at p. 14 of 22.

Accordingly,

The Motion for Summary Judgment is **DENIED** without prejudice to reurge, to allow Amica an opportunity to re-evaluate Plaintiffs' resubmitted exhibits, **provided** however that Plaintiffs submits to Defendant within **10 days of entry of this order** a more clearly organized and succinct set of exhibits in accordance with above observations.  Thereafter, Defendant may reurge the Motion for Summary Judgment within 10 days after receipt of Plaintiffs' submissions.  **Failure to timely comply with above directives may lead to dismissal of claims or waiver of summary process, without further notice**.  Any supplemental briefings should also focus on the viability of punitive damages, especially in view of Plaintiffs' own delays and contradictions in the claims process.

New Orleans, Louisiana, this 19th day of July, 2010.

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE